Q. Now, I guess I'm getting to the point, the section that you wanted to talk about. Did you investigate to determine if the name Serena, S-E-R-E-N-A, was available?

A. You heard me say what we did.

Q. And you sent -- correct me if I'm wrong. You sent a list of names to counsel?

A. We sent the name Serena to counsel and I believe that counsel submitted the name to the U.S. Trademark Office.

Q. And when you submitted the name to counsel did you receive correspondence that indicated that the name was available?

A. I don't have that in front of me, but I believe we would have gotten some kind of affirmative response.

Q. Mr. Levinger, I'm showing you what's been previously marked as Exhibit H and ask you if you recognize that.

A. Yes.

Q. And that's the letter you received from counsel. Obviously, it didn't have a black mark on it. There are certain names that were --

THE WITNESS: Why are these things

blackened out?

MR. RATCLIFFE: You'll have to ask your attorney that.

MR. TAYLOR: Those were portions of the document that related to another trademark that were redacted for confidentiality and other reasons.

MR. RATCLIFFE: Go ahead.

A. I don't know if I saw this document or I didn't because Miss Card worked for Mr. Reynolds. So my sense is that Mr. Reynolds and his secretary probably contacted Salter & Michaelson which was our corporate procedure to check if these particular names were available for use, and my sense is the response that he got is what is said in this document. Incidentally, this is not my handwriting.

Q. Do you know whose handwriting that is?

A. Yeah. I think it's Mike's. So now you've refreshed my memory and maybe Mike was handling this search because, as I said, I don't handle them all myself anyway. So we were trying to I guess research four names and these were the four names that we submitted and I believe he answered

at your behest, and his response was he picked them out of a general line of merchandise from India and that these things were in general distribution. I have no idea whether they are or they are not. That is his word and he used to go into New York to do this merchandising because the diamond houses were in New York, so he would kind of do this on his own.

Q. Did you have any discussions with Mr. Bloom about the strength or weaknesses of Merit's claimed copyright on those designs?

A. No.

Q. Did you have any other discussions with Mr. Bloom regarding this litigation other than what you testified to?

A. No. I can't remember if I -- when you guys first complained about this whether I asked him whether he had any knowledge. He said no. I know that.

Q. Any knowledge of --

A. Well, when this first came out I never knew that you had any copyrights of any kind on this, so obviously, I called him and I said, "How did you pick these things," and he said, "Because

they were in a general line," and he had no knowledge that you had copyrights or anything. I can assure you, if we had known you had a copyright on that piece, we certainly would have chosen something else. There's lots of diamond jewelry in this world to pick from.

Q. Have you ever had any conversations with the manufacturer of those, of that jewelry that you marketed on Page 6 of Exhibit N?

THE WITNESS: The same line?

MR. RATCLIFFE: Yes.

A. No.

Q. You identified the manufacturer as --

A. I think it's not KBS. I think it's KGK. I think that's wrong. I think the manufacturer -- I think our purchasing department supplied you -- may have supplied you with who we bought these things from. I think their name is KGK.

Q. Do you know where they're located?

A. I think they're Indian. Manhattan. Honestly, I've never been to their office.

Q. Do you have any documents from KGK, invoices, any other, you know, orders?

A. I don't. Our purchasing department would

December of '04?
A. (Nodded affirmatively). Yes.
Q. In August of '04, August 24th of '04 you received the letter from Buchanan Ingersoll that's previously been marked as Defendant's C which is the cease and desist order, correct?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes.
Q. You didn't cease and desist selling the disputed design jewelry at that point, did you?
THE WITNESS: This is about Serena now?
MR. RATCLIFFE: It also refers to the --
THE WITNESS: Well, are we talking about Serena or are we talking about -- or both?
MR. RATCLIFFE: Both. Serena and the jewelry.
A. Well, this logo is nothing like ours now that I look at it. It certainly doesn't say by Krementz.
Q. When you say this logo is nothing like ours, you're referring to the --
A. Merit's Sirena logo.

Q. That's the first attachment to the letter?

A. Yes. Well, I think the first thing we did on the Serena end was we contacted our counsel and we asked him what the story was since the Trademark Office had allowed it. And then we decided to stop -- actually, I don't know when we stopped selling Serena because we had materials out there and I think we actually accommodated you with a letter to the customers, which I don't believe you've brought up, but I think we actually sent a letter out to the customers saying we were changing the name Serena to the name Krementz, and assuming you had no objection to that, and I don't remember the exact date that that was sent, but I believe it was sent sometime in there, so there was probably a lag time. In the case of the offending designs or the alleged offending designs on the -- what you call your copyrights, we probably had some stock and probably fulfilled certain obligations that we had on order and then stopped. As you can see by the sales results, neither the product was that effective nor would your damages be.

Q. I guess my question is why didn't you when you