A. For a couple of reasons. First, the sound of it, it was very romantic, it could be a woman's name and it also had the feeling of serenity, which is another, you know, the calming effect and also it gave that European flair.

Q. Did you do any investigation to determine if the name Serena was available?

A. Yes.

Q. And what did you do?

A. We contacted a lawyer, our lawyer's office, gave them the name and they put it through the process.

Q. Do you know what they did to put it -- the name through the process?

A. They did a research on that and came back that we could use the name, that their -- at the time because we asked that on previous names and were turned down because there were other names being used, the other names we had asked for were being used.

Q. And did you deal directly with the attorneys or the attorney?

A. I may have on some occasions, but it was -- I believe most of that was handled by Mike

Reynolds' assistant at the time.

Q. Who was that?

A. Suzanne Card.

Q. I'm showing you what's been previously been marked as Exhibit H and ask you if you've ever seen that letter.

A. Yes.

Q. And did you see that letter at or about the time that it was received by Colibri Corporation in October of 2003?

A. I would probably say yes, that's probably when I saw it. Suzanne probably showed it to me at that point.

Q. And had you reviewed letters or received letters from Salter & Michaelson previously regarding trademark searches or the availability of names?

THE WITNESS: Had I personally?

MR. RATCLIFFE: Yes, or had you reviewed --

A. I may have reviewed.

Q. Did you ever have any conversations with anybody either at the law firm or within Colibri or anyone as to what a preliminary screening was, as what's referred to in the first paragraph of the