APPEARANCES:
Representing the Plaintiff:
PARTRIDGE, SNOW & HAHN
180 South Main Street
Providence, RI 02903
BY: ROBERT K. TAYLOR, ESQ.
401.861.8200

Representing the Defendant:
RATCLIFF, BURKE, HARTEN & ELIAS, LLP
1600 Hospital Trust Tower
Providence, RI 02903
BY: J. RICHARD RATCLIFF, ESQ.
401.331.3400



INDEX

WITNESS: ROBERT SALTER, ESQUIRE

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Ratcliffe | 4 | | | |
| Mr. Taylor | | | | |

| EXHIBIT | | PAGE |
|---|---|---|
| 1 | Subpoena | 6 |
| 2A | Report | 105 |
| 2B | Report | 110 |
| 3 | Accident Report | 109 |
| 4 | Barge Log | 125 |



(Exhibit W, Subpoena, marked for identification.)

MR. RATCLIFFE: Swear the witness in, please.

ROBERT SALTER, ESQUIRE, Witness, first having been duly sworn, deposes and states as follows:

EXAMINATION BY MR. RATCLIFFE:

Q Mr. Salter, you're an attorney?
A Yes.
Q And have you ever been deposed before?
A Maybe 20 years ago.
MR. RATCLIFFE: I represent Merit Diamond Corporation in a case that was filed against Merit Diamond Corporation by Colibri Corporation that's pending in the United States



District Court for the District of Rhode Island and Merit Diamond has filed a counterclaim in that case.
Q In connection with that case, I'm showing you what's been previously marked as Defendant's Exhibit W and ask you if you recognize that document.
A Yes.
Q What is that document?
A A subpoena.
Q And that subpoena was served upon you?
A Yes.
Q And you're here pursuant to the subpoena?
A Yes.
Q The subpoena requested certain documents. Documents had previously been produced by Elliot Salter in this litigation.
Did you make any search to see if there were any additional documents other than what had already been produced by Elliot Salter?
A Every -- I did not. I don't have anything more than what was -- other than

Page 6

what was produced by -- that was everything in the file.
Q So everything with respect to -- with the exception of certain things that you were claiming attorney-client privilege?
A I'm not sure what I'm claiming as attorney-client privilege.
Q When you got the subpoena -- first, who is Elliot Salter?
A He's my father.
Q And he practices law with you?
A Yes.
Q And you got the subpoena?
A Yes.
Q The subpoena that's been marked as Exhibit W?
A Yes.
Q And it has -- attached to the subpoena is an Exhibit A which requests certain documents?
A Yes.
Q And you looked at that exhibit?
A Yes.
Q And what did you do -- what did you

Page 7

do to determine that there are no additional documents?
A I actually should -- can you give me a minute to look at the Exhibit A again?
MR. RATCLIFFE: Sure.
A Is that okay?
MR. RATCLIFFE: Take as much time as you like.

(Pause In Proceedings)

A Any of this material that you're asking for in this exhibit would be in the file that we have on this case, which I assumed Elliot had produced or had brought to the deposition when he was deposed. I have -- I have the material that he brought also, but we don't have anything else other than what's in the file.
Q Is there just one file that you have at your office regarding the Colibri application to use the name Serena? You brought some records with you?
A I brought everything I have; the

Page 8

subpoena. We have the application file.
Q That's what was -- that was -- is that what was filed with the -- filed at the trademark office?
A Yes.
Q At the trademark office?
A Right. And we have a correspondence file and I believe a litigation file.
MR. RATCLIFFE: Have you looked at those?
MR. TAYLOR: No.
MR. RATCLIFFE: Let's go off the record for a second.

(Off The Record Discussion)

MR. TAYLOR: In reviewing the files that Mr. Salter has brought with him this morning, I find that the documents in those files have either previously been produced during the deposition of Elliot Salter or that they've been listed on the privilege log that has been already marked as a

Page 9

deposition exhibit in the series of depositions, specifically Deposition Exhibit B, with one exception, which is a Salter & Michaelson invoice dated October 31, 2003, which we will produce with a redaction. The redaction relates to the fact that the invoice is for services in connection with a registration of two trademarks. One is the Serena trademark. The other is a trademark which we claim is confidential and has no relation to this litigation.
MR. RATCLIFFE: Just so the record is clear, Merit Diamond is not waiving any of its -- any rights with respect to at some point moving to compel production of documents that have been claimed privileged on the basis that the privilege has been waived or any other basis within which to move to compel production of documents.
Could I have the last question

read back, please.

* (Question Read)

Q When you received this deposition Notice, I take it you went to your file -- to the files at Salter & Michaelson and you brought the files with you today?
A Yes.
Q And there are no additional files other than the files that you brought with you today?
A That's correct.
Q And certain records have been produced previously. I note that one of the files that's in front of me is a blue file and that that is the -- you have referred to that as the trademark application file?
A Yes.
Q And previously admitted as Defendant's Exhibit F was, I believe, a copy of portions of that file?
A Portions of the file, yes.
MR. RATCLIFFE: There is some



writing on the outside of that file. Is there a claim of privilege with respect to the exterior of the file?
MR. TAYLOR: No.
MR. RATCLIFFE: Can I just look at it?
MR. TAYLOR: Yes.
MR. RATCLIFFE: Can we make just a copy of the exterior of this?
MR. TAYLOR: That would be okay.
MR. RATCLIFFE: I will not look inside.

(Pause In Proceedings)

MR. RATCLIFFE: Let's have the invoice marked as Defendant's Exhibit X.

(Exhibit X, Invoice, marked for identification.)

Q What was your -- what was your involvement in the initial search to



determine if the name Serena spelled with an E, S-E-R-E-N-A, was available to be -- for trademark by Colibri?
A I did the screening search.
Q Now, there's a document that's been previously admitted and I believe you brought a copy of it today, Exhibit H. I show you what's been marked previously as Defendant's Exhibit H and ask you if you recognize that?
A Yes.
Q What is that?
A That's the search report.
Q And that's what you -- you prepared that search report?
A Yes.
Q Now, the first page -- it's a letter addressed to Suzanne Card Exhibit H, is that correct?
A Yes.
Q And it's regarding trademark searches for five different names?
A Yes.
Q One being Monticello, two being Brunello, three being Francesca and four



being Serena, S-E-R-E-N-A; correct?
A Yes.
Q And the fifth one has been redacted?
A Yes.
Q Now, it's a letter to Suzanne Card. Who is Suzanne Card?
A Fred Levinger's assistant.
Q And the first paragraph says, Dear Suzanne, in accordance with your recent request, we have conducted a preliminary screening search for the above-identified marks in connection with jewelry.
What is a preliminary screening search?
A Basically, just what the words say, it's to see if -- to see if a particular name is available to register.
Q How do you do that?
A There's different data bases that we use to conduct these screening -- the preliminary screening search.
Q What data base did you use with respect to the preliminary screening search for the name Serena?

Page 14

A The United States Patent and Trademark Office data base.
Q Is that what's -- you have the results attached to the correspondence?
A Yes.
Q Now, is there a way to do a phonetic search?
A These searches were phonetic searches.
Q How do you -- how can you tell if they were phonetic searches?
A There's a particular way that you can do the search and it includes phonetics.
Q If we can look at Exhibit H, is there anything on -- in that document that would indicate that the search for Serena was a phonetic search?
A No.
Q Now, you said they were a phonetic search. Is that -- is that still your answer to the question?
A Yes.
Q How do you know the it was a phonetic search?

Page 15

A Because I do the searches quite frequently and I always do it the same way.
Q How is that?
A It's the -- I -- this is not going to make much sense to you. The trademark office data base has different ways that you can conduct the search and I conduct the search in a way that includes phonetic equivalents.
Q How did you do it in connection with Serena?
A That way.
Q But how did you -- how do you physically do it?
A It's really tough to explain without actually showing you on a computer.
Q Do the best you can to explain it.
A I believe when you go into the trademark data base --
Q Is that the trademark electronic search system test?
A Yes.
Q If you look at the document, there's a series of -- at the top there's a series

Page 16

of --
A That's what I was looking at.
Q There's a series of different titles that I believe -- can you click on any one of those?
A Yes.
Q And is that one of the -- do you click on one of those to do a phonetic search?
A No. Before you even -- before you even conduct your search, there's different choices as to what type -- what you want the search to include. The search that I do, I believe, is a basic index search, which includes phonetic equivalents.
Q So physically how -- do you have any specific memory of doing this search for the name Serena?
A I do remember, yes.
Q And do you take any notes when you do the search?
A No.
Q Did you keep any documents regarding the way you went about doing the search other

Page 17

than what's been produced here?
A No.
Q So if you could just proceed, so you say you go in and you do a search which includes the phonetic equivalents; is that correct?
A Yes.
Q How -- you say you have a specific memory how you did the search for the name Serena. How did you do the search for the name Serena?
A I probably put in the name Serena.
Q Spelling it how?
A I spelled in the traditional way.
Q S-E-R-E-N-A?
A Yes, with wild cards on either side of the word.
Q So either something before -- letters or words before Serena and letters or words after Serena?
A Correct.
Q So that's why you're getting -- I believe one of the documents shows that serenade is one of the words that came up; is

Page 18

that correct?
A Right.
Q What else?
A I believe that's it for this particular mark.
Q How would you insure that you're doing a phonetic search?
A It's included in the basic index search.
Q Do you have any -- do you know why when you put S-E-R-E-N-A, the name Serena, that S-I-R-E-N-A did not come up?
A A glitch in the trademark office data base search system.
Q Did you ever confirm that?
A There would be no way to confirm that. That's the only conclusion, rational conclusion that I could come to.
Q And is it your testimony that you don't have to do anything special to do the phonetic search, that as soon as you put the name in S-E-R-E-N-A, it's supposed to search for any phonetic equivalent?
A That's correct.

Page 19

Q Now, why do you refer to it as a preliminary screening search?
A Because there are different types of searches that you can do. There are more thorough and extensive searches that can be done. The preliminary screening search is a relatively good indicator as to the availability of the mark for registration purposes and it's a relatively inexpensive search and 95 percent of the time, it's adequate enough.
Q What are the more extensive searches that can be done?
A Thompson & Thompson has a full search which includes the Federal Trademark Office data base and then also includes unregistered marks.
Q How much does it cost to do a Thompson & Thompson search?
A Somewhere probably between 500 and $1,000.
Q How much does it cost -- does it cost anything to use the Federal Trademark Office data base?

Page 20

A No, the data base is free.
Q Anything more thorough, any other more thorough searches that can be conducted?
A The other data base that I use sometimes is Sagis (phonetic) which is another on-line data base. And that's more -- it's very similar to this search to the patent and trademark office data base.
Q Is there a cost for Sagis?
A Yes, there is.
Q Why would one use Sagis rather than the patent and trademark office search?
A It has some information in it that the patent and trademark office doesn't have.
Q What type of information?
A It has opposer. If an application is being opposed, it will give you information as to who the opposing party is. The trademark office data base doesn't include that information for some reason.
Q Now, when you discuss with clients the search, the types of searches that can be done, do you go over with them that there can be a preliminary search, we do the Thompson,

Page 21

we can do Sagis; is that one of the things that you do?
A Yes.
Q And when you had discussions with Suzanne Card, did you have any discussions as to what type of search would be conducted, whether it be a preliminary search or a more thorough search?
A We've been doing searches -- my father's been working with them for quite some time, so they -- it's just understood that we always start off with -- we just do preliminary searches for them. That's just sort of the way the business relationship is; it's the type of search that we do for them.
Q And what's the next step after the preliminary search?
A To apply to register if the mark is available.
Q And did you do that in this case?
A Yes, we did.
Q And what happens after the application to register?
A It goes through prosecution history

Page 22

with the trademark office.
Q And did that happen in this case?
A Yes, it did.
Q And so you made an application to register the name Serena, S-E-R-E-N-A?
A Yes.
Q And what's previously been marked as Exhibit F, is that what's called the prosecution history?
A Yes.
Q And did you prepare the documents in connection with this -- that are contained in Exhibit F in connection with this prosecution history?
A Some of them.
Q And attached to the -- as part of Exhibit F, you can see that the pages are numbered?
A Yes.
Q Is the first document that was filed page 36 of Exhibit F?
A That's Colibri's trademark application that was filed with the patent and trademark office.

Page 23

Q That was filed on October 31, 2003?
A Yes.
Q And there's a declaration that you sign on page 37?
A As part of the application, yes.
Q Is that a standard declaration that must be included in all applications?
A Yes.
Q When was the first time that you learned that there was a mark Sirena, S-I-R-E-N-A, for jewelry?
A It was Merit's letter to us, to Mr. Levinger.
Q That was -- was that what's been -- showing you what's previously been marked as Defendant's Exhibit C, is that the letter you're referring to?
A Yes, yes, that would be the first time.
Q That was a letter of August 24, 2004?
A Yes.
MR. RATCLIFFE: You can look at it.

Page 24

A Yes.
Q And I notice in the trademark file that you have produced or that has been produced, the application -- it's an attorney's reference, examiner's -- maybe you can look at pages 34 and 33. Are those two pages, should they be read in conjunction with each other, 33 and 34 of Exhibit F?
A Page 34 is just the filing receipt from the trademark office.
Q So that they've sent that back to you after you sent the application in?
A Correct. And 33 is much later on in the prosecution, after the examiner in the trademark office has reviewed the application, done their search and then they'll do their search to see if they find any marks that are confusingly similar and if they don't find anything, then they go through the application for informalities and this was an informality that was needed to be cured on the application.
Q If we can look at page 35, the certificate of mailing.

Page 25

A Okay.
Q Now, it speaks in terms of executed intent to use trademark application with formal drawing. Was there a formal drawing that was filed in this?
A This is the formal drawing, this page right here.

(Witness Indicating)

Q Which is page 38?
A Yes.
Q Then the -- page 34, the receipt -- that's what you refer to as the filing receipt?
A Yes.
Q And drawing type stylized words, letters or numbers, is that referring to again page 38 of the -- of Exhibit F?
A Yes; except it's incorrect. It should actually -- they're not stylized words. They're actually standard. They're block letters, standard character format.
Q So who --

Page 26

A For some reason, that was -- that is not right, but that's why there's the examiner's amendment to fix it.
MR. RATCLIFFE: I see.
Q So the mark is -- the examiner's amendment is a mark presented in standard character without claim to any particular font, style, size or color?
A Right.
Q Does that mean that you could -- you own the mark -- for the purpose of that, you own the mark no matter how it's written; whether it's written in cursive or block?
A For instance, your client's mark is in stylized.
Q So what page are you referring to of the exhibit?
A Twenty-seven.
Q Of Exhibit F?
A Yes.
Q So I guess my question is if you own the mark for Serena in block letter, S-E-R-E-N-A, would you also own the mark for Serena stylized?

Page 27

A In any kind of -- it doesn't make sense to file them stylized unless that stylized version is very important. It limits you to that.
Q Now, what -- what happened next after -- with respect to the application for trademark registration?
A It went through the trademark office, was published for opposition, at which time Merit opposed the application.
Q And Merit's opposition is included within Exhibit F?
A Yes.
Q And actually, one of the exhibits attached to their opposition is the test trademark search for the name Sirena, S-I-R-E-N-A, on Exhibit 28; is that correct?
MR. TAYLOR: Object to the form of the question.
MR. RATCLIFFE: If you know.
A Yes, you have to repeat the question.
Q What is page 21 of Exhibit F, if you know?

Page 28

A That's a printout from the trademark office data base of the Sirena mark.
Q On that printout, it says record six of twenty-four. What does that mean on page 21 of Exhibit F?
A That means there were 24 records uncovered in this particular search.
Q Now, if we go back to Exhibit H, when you did the search for Serena, I take it you came up with four records?
A In that particular search, yes.
Q And there are only two that are attached to your letter, serenade and serenade?
A I think there's three; nature serenade.
Q How come there are only three if there were four --
A Probably because of the fourth was either abandoned or was just not of interest, was not relevant.
Q And what was the next thing that happened with respect to the trademark application after the filing of the notice of

Page 29

opposition?
A I'm not sure if we answered the opposition. We probably answered the notice of opposition.
Q Is there any indication in the documents that you provided that you answered the notice of opposition?
A Perhaps we did. On the -- no answer has been filed, so we didn't even answer the opposition.
Q And at some point you filed an express abandonment?
A Of the application.
Q When was that?
A November 17, 2004.
Q What is that?
A That is withdrawal of our application for Serena.
Q Now, you were referring to the outside cover of the blue folder, that's your trademark file?
A Yes.
MR. RATCLIFFE: And if I can have this marked.

(Exhibit Y, Copy of Cover of Folder, marked for identification.)

THE WITNESS: I wouldn't really rely on that. I would -- this is what you would want to rely on for that, the actual express abandonment document.

Q And if you can look at -- that's part of Exhibit F?

THE WITNESS: Are you asking me?

MR. RATCLIFFE: Yes, it is a question.

A Yes, it's number three.

Q Page three?

A Yes.

Q I show you what's been marked as Defendant's Exhibit Y and is that a copy of -- a true and accurate copy of what you have in front of you the outside cover of the trademark application file that's kept at Salter & Michaelson's offices?

A Yes.



Q Whose writing is that?

A Greta Kelly.

Q Who is Greta Kelly?

A Elliot's secretary.

Q And office actions, what's on -- what's on the left-hand side of the file, of the -- there's two categories, office actions and amendments; correct?

A Yes.

Q It says June 1, 20004, EXR AM; what does that mean?

A Examiner's amendments.

Q That's what we've referred to previously, you just referred to it as just a minor --

A Standard character claim statement that needed to be entered into the application.

Q And then the next thing is the request for extension of -- well, he EXT, extension in time to file opposition, 9/15/04?

A That was -- Merit had filed that.

Q 9/15/04 until November 6, 2004 by



Merit Diamond Corporation.

A I guess they weren't sure if they wanted to oppose the application or wanted more time. You only have a 30-day window period to oppose.

Q Then October 24, 2004 is the notice of opposition by Merit Diamond?

A That's correct. That's when they actually filed it, right.

Q Then the next thing is express abandonment?

A Yes.

Q Then the date, March 10, 2004 notice of default in opposition. What does that mean?

A Because we never answered the opposition. The abandonment of the application and the opposition are two separate proceedings in the trademark office.

Q Then there's -- under that it says published in OG of and written in, September 7, 2004 register. Then you have checked principal.

What does that mean?



A After the trademark application makes its way through the trademark office, it's then published in the official Gazette. It's a weekly publication that comes out with the trademark office for marks that are going to issue and the registrations. People can monitor them to see if the marks may damage their business. If they want to oppose, they have a 30-day period to oppose the application, issuing the registration. Then the principal is the type of register in which the registration will issue on.

Q What does that mean exactly?

A It's the standard register that most trademarks, other than descriptive trademarks are issued onto.

Q So this type of trademark that Merit was seeking was not a so-called descriptive trademark?

A No.

Q What type of trademark was it?

A It would probably be considered arbitrary or fanciful.

Q What is a descriptive trademark?

Page 34

A Describes the product or the service.
Q So it's your testimony that you don't have to do anything special with the test search engine to request phonetic equivalents, that the search engine will automatically or is supposed to automatically provide phonetic equivalents?
A As long as you choose that particular search.
Q Is there any documentation that you have that would show that you chose that particular search?
A There is not.
Q And how do you choose that particular search? How do you specifically chose the phonetic option?
A There are a number of different types of searches that you can do. I do the same one all of the time. I believe it's a basic index search under the structured form search heading and there's a pull-down window and if you choose the basic index, it says what's included in the basic index. Phonetic

Page 35

equivalent is one of them, one of the things that's included in the search strategy.
Q So if I -- I can go on -- do you have to be a member or have some sort of password to go on the trademark patent -- trademark office, to get into the test?
A No.
Q So you go to the trademark electronic search system and what do you -- your normal search, what do you hit first on -- do you go to one of those buttons at the top?
A No. You would go to test.
MR. RATCLIFFE: Yes.
A Then I believe it's structured form search. Then you would go to the pull-down window and go basic index. Then you start typing your search strategies into the box, depending on what the particular trademark is.
Q Your search strategy was Serena, then, Serena, S-E-R-E-N-A then with the extenders on each side?
A Yes.

Page 36

Q Anything else?
A I believe that was all I did for this particular search.
Q How long approximately did it take you to do the search?
A Depending on the mark, it takes a different amount of time, but I would say generally just to get the most relevant hits back from the trademark office, it would be a half hour per search.
Q Do you have any memory how long it took you to do this search?
A I would say probably about -- if that was all I did, probably not too much time at all.
Q Five minutes, ten minutes?
A Yes.
Q That's -- do you have a specific memory of that's what you did with respect to the search for Serena or that's -- are you basing that on that's what you always do? Is your habit and routine basically to go and put the name in with the extenders and go to that --

Page 37

A It's different for every mark that's being searched. I don't have -- when I look at the results of the search, that's what leads me to believe that that was probably all that was done.
Q Why is that?
A Because if there were only four marks uncovered, the only way I could see that that would have happened is if Serena was done, spelled out in the traditional sense with the wild card on each side.
Q What other strategies could you have used besides the strategy that you employed?
A I could have -- I'm not 100 percent sure I didn't do this, but based on what I'm seeing here and the results of the search, I could have done a search with R-E-N-A with a wild card in front of the R or I could have done a search S-E-R-E with a wild card after the E.
Q If you did R-E-N-A, would S-I-R-E-N-A come up?
MR. TAYLOR: Object to the form of the question.

Q In the normal course?
A It should have, yes.
Q You have no documentation to indicate that you did R-E-N-A with a wild card in front of it?
A I'm thinking that I probably didn't.
Q Is -- I notice in your invoice that you sent to Colibri, which has been marked as Exhibit X, it says preparation of filing of application for registration of the above-identified mark on the principal register of US Patent and Trademark Office with a $950 legal fee for that?
A Yes.
Q How do you charge for the initial searches that you do, the preliminary searches?
A We have like a flat rate charge for that, also.
Q What's your flat rate charge?
A About 150.
Q Per search?
A Per mark.
Q Per mark?



A Per mark.
Q So is there an invoice related to that? Is that included in that?
A No, it is not.
Q Would there be a separate invoice for that?
A It would have been attached to the search report here that there were five marks. So since there were five marks, I probably charged less than 150 per mark.
Q Do you have a copy of that invoice?
A For some reason, it just doesn't seem to be in here. Here it is. Yes, this is it.
MR. TAYLOR: Let's make a copy of it.
MR. RATCLIFFE: Okay.
MR. TAYLOR: I'd like to redact the one name that is still sensitive.

(Pause In Proceedings)

(Exhibit Z, Invoice, marked for identification.)



Q Let me show you what's been marked as Exhibit Z and ask you if you recognize that.
A Yes.
Q What is that?
A That's the invoice for the preliminary screening search, trademark search.
Q For five different marks?
A Yes.
Q Now, there's a charge on there for data base charges. Is that just something you charge clients or is that for -- do you actually go onto a data base and get charged the $50?
A We usually charge about $15 per mark just to cover internet expenses, Cox Communication expenses from getting on the internet.
Q So that's not -- that's not indicating you went on Thompson or any other search?
A No, it's not.



Q When you found out when the -- when Colibri got the letter alleging that -- the cease and desist letter which we've referred to previously as Exhibit C, did you go back into the test system and redo the search to see if you did anything wrong, to see if you came up with the name Serena? Did you do any -- anything like that?
A I think all that was done was -- well, actually, I probably didn't even do that because that was enclosed here, so no.
Q You didn't go back on to see how the name -- to investigate and to see how the name Sirena never came up, S-I-R-E-N-A?
A No.
Q So you've never gone back on the test system to put in S-E-R-E-N-A as a phonetic search to see if the name --
A No.
Q -- Sirena came up?
A I have not. You know, I'm not 100 percent sure about that. At the time maybe I did the -- as far as I can remember, I did not.

Page 42

Q Would there be any documentation or anything you could look at that would refresh your recollection?
A No.
Q Now, are you aware if at the time you did the prescreening search in October of 2003 for the name Serena, S-E-R-E-N-A, if Colibri was using that mark in commerce?
A I think they were not. They usually have us run the search before they begin using it.
Q Now, on the basis of the prescreening search, did you instruct Colibri whether or not they should commence using the name Serena in commerce?
A I believe we, you know, the search -- the screening search is really just a search as to the availability to register. It's really, you know, there could be some, you know, unregistered user out there and the search wouldn't turn that up.
Q So what do you -- so what do you advise clients to do in that situation?
A It's their decision whether -- it's

Page 43

a relatively good indicator as to the availability of use. So it's really a business decision on their part as to whether or not they want to go forward and do a more thorough search. I'd say, you know, 95 to 99 percent of the time this search is going to be -- is going to be enough.
Q Did you have any discussions with anybody at Colibri as to whether or not they should go forward and do a more thorough search?
MR. TAYLOR: Let me just caution you, first it's a yes or no question.
A No.
Q Did you raise that issue with anybody at Colibri with respect to the use of the name Serena S-E-R-E-N-A in commerce?
A Can you repeat that question.
Q Did you raise that issue, did you raise the issue of whether or not a further search should be conducted in connection with the use of the name Serena, S-E-R-E-N-A in connection with the marketing and

Page 44

distribution of jewelry prior --
A No.
Q Did -- were you advised by anybody at Colibri that Serena, the name Serena was going to be used by them in commerce at some point in the future?
A Yes.
Q Who advised you of that?
A I don't know.
Q Did you have any discussions with anybody at Colibri at the point that you were advised that the name Serena was going to be used in commerce regarding any further due diligence or searches that should be commenced prior to using the name in commerce?
A No. It probably should be understood that I really just did the search. Elliot was probably the one that handled most of the correspondence. He would be better able to answer these questions that you're asking me now.
Q Approximately how many searches do you conduct in a monthly period on average?

Page 45

A Thirty.
Q What other -- is your practice primarily trademark?
A Yes.
Q What other type of work do you do at the offices of Salter & Michaelson in connection with trademark applications beside searches?
A Prosecution of the application before the trademark office, infringement situations, opinion work, things of that nature.
Q Now, I'm showing you what's been marked as Defendant's Exhibit J and ask you if you recognize that document.
A Yes.
Q What is that?
A This is just an in-house form that we have in our office just to get the information that we need in order to accurately prepare the application.
Q And whose writing is that?
A That is my writing.
Q And do you know how you got that

information that's included on that form?
A It was given to me from Colibri.
Q Do you know who at Colibri?
A Suzanne Card.
Q And I take it -- on that document you have ITU under intent to use or intend to use. I take it that means intent to use --
A Right.
Q -- that they're not actually using it?
A Right.
Q Did you have any discussions with anybody in your office or with Mr. Elliott Salter regarding if as a result of the name Sirena not coming up, S-I-R-E-N-A, when you did your search, if you should change the way you conduct your searches?
A We very rarely have a problem. You know, every once in a while, there will be a reference that escapes detection. I mean, I'm sure if it was something that happened on a monthly basis, then maybe we would have had that discussion. But we don't really run into these problems too often.



Q Do you remember the last time a problem like this occurred?
A No.
Q Do you remember a problem like this ever occurring?
A Yes, I do remember now. It was for a client in Fall River where we had a reference that was missed in the search and an application was filed and the trademark office, when they did their search, they found the -- they found the reference and cited against it, said we're not going to give you the registration because of this prior registration, and it was just -- it was a reference that should have been uncovered in the search and it wasn't -- that was years ago.
MR. RATCLIFFE: And I take it you're still asserting attorney-client privilege with respect to any communications with Colibri, between Colibri and anyone at Salter & Michaelson regarding the cease and desist letter, whether or not they



should cease using the mark Serena at that point in August when they received the cease and desist letter?
MR. TAYLOR: That's right.
MR. RATCLIFFE: Note my objection. I won't ask the questions. I'll note that those questions were asked in the Elliott Salter deposition and I'm reserving my right to recall this witness if we do move to compel responses to deposition questions and the court allows the deposition questions regarding that area to be undertaken.
Other than that, I'm complete.
MR. TAYLOR: Mr. Salter, I just wanted to ask you a couple of clarifying questions.

EXAMINATION BY MR. TAYLOR:

Q How long have you been practicing trademark law?



A Seven years, eight years.
Q And how long has your father been practicing trademark law?
A Too long, 50 years.
Q And in conducting trademark searches, do you rely on your father's expertise as well as your own?
A Yes.
Q In the period of time that you personally have been conducting trademark searches, has it been common for you to conduct the type of search that you conducted for Colibri in this case?
A Yes.
Q Can you describe for us how common it is, in other words, the rough percentage of searches that you conduct that are done through the test system as opposed to some other method?
A Most of them are done through the test system.
Q And you conduct searches through the test system for clients other than Colibri?
A Yes.

Q There was some discussion about a phonetic search. Do you recall that discussion?
A Yes.
Q Can you just describe for us your understanding of what a phonetic search is?
A A phonetic equivalent is a mark that sounds the same but is spelled different and it's just -- it's included in the type of search that I do. The search results are supposed to include phonetic equivalents because the trademark office does phonetic equivalents and if there are two marks and they're spelled differently but they're phonetic equivalents, one is going to be a bar to the other. So it's an important thing to be able to uncover in a search because phonetic equivalents are going to present a problem from a registration point of view at the trademark office.
Q Do you know how the trademark office goes about deciding whether or not certain terms are phonetic equivalents?
A I'm not sure if it's a clear-cut,



black and white situation, whether a mark is a phonetic equivalent or not. I think I pretty much have the idea when you look at the two words, but there has been situations where I looked at something, you know, and uh-oh, you wonder if this would be considered a phonetic equivalent. So in most situations, I'm able to determine whether it is, but I'm sure there are situations where I guess it would be a close call.
Q Do you know whether or not Serena spelled S-E-R-E-N-A and Sirena spelled S-I-R-E-N-A are phonetic equivalents?
A No, I don't know for sure. My gut feeling would be that yes, they are.
Q Well, is it possible that S-I-R-E-N-A and S-E-R-E-N-A are not phonetic equivalents?
MR. RATCLIFFE: Objection.
A Anything's possible.
MR. TAYLOR: No further questions.
MR. RATCLIFFE: Thank you. I have no further questions.



STENOGRAPHER: Would you like to order a copy of the transcript?
MR. TAYLOR: I'll take just the new exhibits, please and I'd like a mini and disc, please.
MR. RATCLIFFE: I'll take an original and a mini with all of the exhibits.
STENOGRAPHER: Thank you.

(Deposition Concluded at 11:54 a.m.)



CERTIFICATION

I, Darlene Coppola, a Notary Public, do hereby certify that ROBERT Salter came before me on the 8th day of June, 2005 in Providence, Rhode Island, and was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the statement is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND THIS 16th day of June, 2005.

DARLENE M. COPPOLA
NOTARY PUBLIC
REGISTERED PROFESSIONAL REPORTER

Today's Date: June 16, 2005
To: Robert K. Taylor, Esq.
Copied to: J. Richard Ratcliffe, Esq.
From: Darlene M. Coppola, RPR
Deposition of: Robert Salter, Esquire
Taken: June 8, 2005
Action: COLIBRI Vs. MERIT DIAMOND

---

Enclosed is a copy of Mr. Salter's deposition. Pursuant to the Rules of Civil Procedure, Mr. Salter has thirty days to sign the deposition from today's date.

Please have Mr. Salter sign the enclosed signature page. If there are any errors, please have him mark the page, line and error on the enclosed correction sheet. He should not mark the transcript itself. This addendum should be forwarded to all interested parties.

Thank you for your cooperation in this matter.



SIGNATURE PAGE

I, ROBERT SALTER, say that I have read the foregoing deposition and hereby declare under penalty of perjury the foregoing is true and correct.

Executed this ______ day of ___________, 2005, at ____________,
______________________________.

______________________________
ROBERT SALTER



CORRECTION PAGE

PAGE LINE SHOULD READ

**A**

**abandoned** 28:20
**abandonment** 29:12 30:9 32:11,17
**ability** 53:13
**able** 44:21 50:17 51:8
**above-identified** 13:11 38:11
**Accident** 3:14
**accurate** 30:20
**accurately** 45:21
**action** 53:18 54:7
**actions** 31:5,7
**actual** 30:9
**addendum** 54:17
**additional** 5:21 7:1 10:10
**addressed** 12:17
**adequate** 19:11
**admitted** 10:20 12:6
**advise** 42:23
**advised** 44:3,8,12
**ago** 4:19 47:17
**alleging** 41:2
**allows** 48:12
**amendment** 26:3,6
**amendments** 31:8,12
**amount** 36:7
**answer** 14:20 29:8,9 44:21
**answered** 29:2,3,6 32:16
**anybody** 43:9,17 44:3 44:11 46:13
**Anything's** 51:20
**APPEARANCES** 2:1
**application** 7:22 8:1 10:18 20:16 21:23 22:4,23 23:5 24:4,12 24:16,20,22 25:3 27:6 27:10 28:24 29:13,18 30:22 31:18 32:3,18 33:1,10 38:10 45:9,21 47:9
**applications** 23:7 45:7
**apply** 21:18
**approximately** 36:4 44:23
**arbitrary** 33:23
**area** 48:13
**asked** 48:8
**asking** 7:13 30:12 44:22
**asserting** 47:19
**assistant** 13:7
**assumed** 7:15
**attached** 6:18 14:4 22:16 27:15 28:13 39:7
**attorney** 4:15
**attorney's** 24:5
**attorney-client** 6:5,7 47:19
**August** 23:20 48:2
**automatically** 34:7,7
**availability** 19:8 42:18 43:2
**available** 12:2 13:17 21:19
**average** 44:24
**aware** 42:5
**a.m** 1:18 52:11

**B**

**B** 9:3
**back** 10:1 24:11 28:8 36:9 41:4,12,16
**bar** 50:16
**Barge** 3:15
**base** 13:22 14:2 15:6,19 18:14 19:16,24 20:1,4 20:6,8,19 28:2 40:13 40:15
**based** 37:15
**bases** 13:19
**basic** 16:14 18:8 34:21 34:23,24 35:17
**basically** 13:15 36:22
**basing** 36:21
**basis** 9:20,21 42:12 46:22
**believe** 8:8 10:21 12:6 15:18 16:4,14 17:23 18:4 34:20 35:15 36:2 37:4 42:16
**best** 15:17 53:12
**better** 44:20
**black** 51:1
**block** 25:23 26:13,22
**blue** 10:16 29:20
**box** 35:18
**brought** 7:15,17,23,24 8:18 10:8,11 12:6
**Brunello** 12:24
**BURKE** 1:15 2:10
**business** 21:14 33:8 43:3
**buttons** 35:11

**C**

**C** 23:16 41:4
**CA** 1:8
**call** 51:10
**called** 22:8
**card** 12:17 13:5,6 21:5 37:11,18,19 38:5 46:4
**cards** 17:16
**case** 4:21 5:3,4 7:14 21:20 22:2 49:13
**categories** 31:7
**cause** 53:8
**caution** 43:13
**cease** 41:3 47:23 48:1,3
**certain** 5:17 6:4,20 10:14 50:22
**certificate** 24:24
**CERTIFICATION** 53:1
**Certified** 1:22
**certify** 53:3,14
**change** 46:16
**character** 25:23 26:7 31:16
**charge** 38:15,18,20 40:12,14,17
**charged** 39:10 40:15
**charges** 40:13
**checked** 32:23
**choices** 16:12
**choose** 34:9,15,23
**chose** 34:12,17
**cited** 47:12
**Civil** 54:10
**claim** 9:12 11:2 26:7 31:16
**claimed** 9:19
**claiming** 6:5,6
**clarifying** 48:18
**clear** 9:15
**clear-cut** 50:24
**click** 16:4,8
**client** 47:7
**clients** 20:21 40:14 42:23 49:23
**client's** 26:14
**close** 51:10
**Colibri** 1:6 4:23 7:21 12:3 38:8 41:2 42:8 42:13 43:9,17 44:4,11 46:2,3 47:21,22 49:13 49:23 54:7
**Colibri's** 22:22
**color** 26:8
**come** 18:12,18 28:17 37:22
**comes** 33:4
**coming** 46:15
**commence** 42:14
**commenced** 44:15
**commerce** 42:8,15 43:18 44:5,13,16
**common** 49:11,15
**Communication** 40:19
**communications** 47:21
**compel** 9:18,22 48:10
**complete** 48:15
**computer** 15:16
**concerning** 53:7
**Concluded** 52:11
**conclusion** 18:17,18
**conduct** 13:20 15:7,7 16:11 44:24 46:17 49:12,17,22
**conducted** 13:10 20:3 21:6 43:22 49:12
**conducting** 49:5,10
**confidential** 9:12
**confirm** 18:15,16
**confusingly** 24:18
**conjunction** 24:7
**connection** 5:4 9:9 13:12 15:10 22:12,13 43:22,24 45:7
**considered** 33:22 51:6
**contained** 22:12
**controversy** 53:8
**cooperation** 54:19
**Copied** 54:3
**Coppola** 1:20 53:2,22 54:4
**copy** 10:21 11:9 12:7 30:2,19,20 39:11,15 52:2 54:9
**Corporation** 1:6,9 4:21 4:23,23 32:1
**correct** 10:13 12:18 13:1 17:6,21 18:1,24 24:13 27:17 31:8 32:8 55:7
**correction** 54:16 56:1
**correspondence** 8:7 14:4 44:20
**cost** 19:18,22,23 20:9
**counsel/attorney** 53:15
**counterclaim** 5:3
**couple** 48:17
**course** 38:1
**court** 1:1 5:1 48:12
**cover** 29:20 30:2,21 40:18
**Cox** 40:18
**CROSS** 3:3
**cured** 24:22
**cursive** 26:13

**D**

**D** 3:1
**damage** 33:7
**Darlene** 1:20 53:2,22 54:4
**data** 13:19,22 14:2 15:6 15:19 18:14 19:16,24 20:1,4,6,8,19 28:2 40:13,15
**date** 32:13 54:1,12
**dated** 9:4
**day** 53:4,19 55:8
**days** 54:11
**Dear** 13:8
**deciding** 50:22
**decision** 42:24 43:3
**declaration** 23:3,6
**declare** 55:5
**default** 32:14
**Defendant** 1:10 2:9
**Defendant's** 5:6 10:21 11:17 12:8 23:16 30:19 45:14
**depending** 35:19 36:6
**deposed** 4:17 7:16
**deposes** 4:10
**deposition** 1:14 7:16 8:22 9:1,2 10:5 48:8 48:11,12 52:11 54:5 54:10,12 55:5
**depositions** 9:2
**describe** 49:15 50:5
**Describes** 34:1
**descriptive** 33:15,18,24
**desist** 41:3 47:24 48:3
**detection** 46:20
**determine** 7:1 12:1 51:8
**Diamond** 1:9 4:21,22 5:2 9:15 32:1,7 54:7

**different** 12:21 13:19 15:6 16:3,11 19:3 34:18 36:7 37:1 40:10 50:8
**differently** 50:14
**diligence** 44:14
**DIRECT** 3:3
**disc** 52:5
**discuss** 20:21
**discussion** 8:15 46:23 50:1,3
**discussions** 21:4,5 43:8 44:10 46:12
**distribution** 44:1
**District** 1:1,2 5:1,1
**document** 5:7,9 12:5 14:15 15:23 22:20 30:9 45:15 46:5
**documentation** 34:11 38:3 42:1
**documents** 5:18,18,21 6:20 7:2 8:20 9:18,23 16:23 17:23 22:11 29:6
**doing** 16:17,24 18:7 21:9
**drawing** 25:4,4,6,17
**due** 44:13
**duly** 4:9 53:5

E

**E** 3:1 12:2 37:20
**eight** 49:1
**either** 8:20 17:16,18 28:20
**electronic** 15:20 35:9
**ELIAS** 1:15 2:10
**Elliot** 5:19,22 6:9 7:15 8:22 44:19
**Elliott** 46:13 48:8
**Elliot's** 31:4
**employed** 37:13
**employee** 53:15,16
**enclosed** 41:11 54:9,13 54:16
**engine** 34:5,6
**entered** 31:17
**equivalent** 18:23 35:1 50:7 51:2,7
**equivalents** 15:9 16:15 17:5 34:6,8 50:11,13 50:15,18,23 51:13,18
**error** 54:15
**errors** 54:14
**escapes** 46:20
**Esq** 1:14 2:6,13 54:2,3
**Esquire** 3:2 4:8 54:5
**exactly** 33:13
**examination** 4:13 48:21 53:10
**examined** 53:9
**examiner** 24:14
**examiner's** 24:5 26:3,5 31:12
**exception** 6:4 9:3
**executed** 25:2 55:8
**exhibit** 3:10 4:1 5:6 6:16,19,22 7:4,13 9:1 9:3 10:21 11:17,20 12:7,9,17 14:14 22:8 22:13,17,21 23:16 24:8 25:19 26:17,19 27:12,17,23 28:5,8 30:2,11,19 38:9 39:23 40:3 41:4 45:14
**exhibits** 27:14 52:4,8
**expenses** 40:18,19
**expertise** 49:7
**explain** 15:15,17
**express** 29:12 30:9 32:10
**EXR** 31:10
**EXT** 31:20
**extenders** 35:23 36:23
**extension** 31:20,21
**extensive** 19:5,12
**exterior** 11:3,9

F

**F** 10:21 22:8,13,17,21 24:8 25:19 26:19 27:12,23 28:5 30:11
**fact** 9:7
**Fall** 47:7
**fanciful** 33:23
**far** 41:23
**father** 6:10 49:2
**father's** 21:10 49:6
**Federal** 19:15,23
**fee** 38:13
**feeling** 51:15
**fifth** 13:3
**file** 6:2 7:14,19,20 8:1,8 8:8 10:6,16,18,22,23 11:1,3 24:2 27:2 29:21 30:22 31:6,21
**filed** 4:22 5:3 8:3,3 22:20,23 23:1 25:5 29:9,11 31:23 32:9 47:9
**files** 8:18,20 10:7,8,10 10:11,16
**filing** 24:9 25:14 28:24 38:9
**financially** 53:17
**find** 8:19 24:17,19
**first** 4:9 6:8 12:16 13:8 22:20 23:9,18 35:10 43:13
**five** 12:21 36:16 39:8,9 40:10
**fix** 26:3
**flat** 38:18,20
**folder** 29:20 30:3
**follows** 4:10
**font** 26:8
**foregoing** 55:5,6
**form** 27:18 34:21 35:15 37:23 45:18 46:1
**formal** 25:4,4,6
**format** 25:23
**forward** 43:4,10
**forwarded** 54:18
**found** 41:1 47:11,11
**four** 12:24 28:10,18 37:7
**fourth** 28:19
**Francesca** 12:24
**Fred** 13:7
**free** 20:1
**frequently** 15:2
**front** 10:16 30:21 37:18 38:5
**full** 19:14
**further** 43:21 44:13 51:21,24 53:14
**future** 44:6

G

**Gazette** 33:3
**generally** 36:8
**getting** 17:22 40:19
**give** 7:3 20:17 47:13
**given** 46:2 53:12
**glitch** 18:13
**go** 8:12 15:18 17:4 20:23 24:19 28:8 35:3 35:5,8,11,13,16,17 36:22,23 40:15 41:4 41:12 43:4,10
**goes** 21:24 50:22
**going** 15:4 33:5 43:6,7 44:5,12 47:12 50:15 50:18
**good** 19:7 43:1
**Greta** 31:2,3
**guess** 26:21 32:2 51:10
**gut** 51:14

H

**H** 12:7,9,17 14:14 28:8
**habit** 36:22
**HAHN** 2:3
**half** 36:10
**HAND** 53:19
**handled** 44:19
**happen** 22:2
**happened** 27:5 28:23 37:9 46:21
**happens** 21:22
**HARTEN** 1:15 2:10
**heading** 34:22
**history** 21:24 22:9,14
**hit** 35:10
**hits** 36:8
**Hospital** 1:16 2:11
**hour** 36:10

I

**idea** 51:3
**identification** 4:2 11:21 30:4 39:24
**important** 27:3 50:16
**include** 16:13 20:20 50:11
**included** 18:8 23:7 27:11 34:24 35:2 39:3 46:1 50:9
**includes** 14:13 15:8 16:15 17:5 19:15,16
**incorrect** 25:20
**index** 16:14 18:8 34:21 34:23,24 35:17
**indicate** 14:16 38:4
**indicating** 25:9 40:22
**indication** 29:5
**indicator** 19:7 43:1
**inexpensive** 19:9
**informalities** 24:20
**informality** 24:21
**information** 20:13,15 20:18,20 45:20 46:1
**infringement** 45:10
**initial** 11:24 38:15
**inside** 11:12
**instance** 26:14
**instruct** 42:13
**insure** 18:6
**intend** 46:6
**intent** 25:3 46:6,7
**interest** 28:20
**interested** 53:17 54:18
**internet** 40:18,20
**investigate** 41:13
**invoice** 9:4,8 11:17,20 38:7 39:2,5,11,23 40:7
**involvement** 11:24
**in-house** 45:18
**Island** 1:2,17 5:2 53:5
**issue** 33:6,12 43:16,20 43:21
**issued** 33:16
**issuing** 33:10
**ITU** 46:6

J

**J** 2:13 45:14 54:3
**jewelry** 13:12 23:11 44:1
**June** 1:18 31:10 53:4 53:19 54:1,6

K

**K** 2:6 54:2
**keep** 16:23
**Kelly** 31:2,3
**kept** 30:22
**kind** 27:1
**know** 14:23 18:10 27:20,24 41:21 42:16 42:19,20 43:5 44:9 45:24 46:3,19 50:21 51:5,11,14
**knowledge** 53:7,13

L

**law** 6:11 48:24 49:3
**leads** 37:4
**learned** 23:10
**left-hand** 31:6
**legal** 38:13
**letter** 12:16 13:5 23:12 23:16,20 26:22 28:13 41:2,3 47:24 48:3

letters 17:19,19 25:18 25:23
Let's 8:12 11:16 39:15
Levinger 23:13
Levinger's 13:7
limits 27:4
line 54:15 56:4
listed 8:23
litigation 5:19 8:8 9:13
LLP 2:10
log 3:15 8:24
long 34:9 36:4,11 48:23 49:2,4
look 7:4 11:5,11 14:14 15:23 23:23 24:6,23 30:10 37:2 42:2 51:3
looked 6:22 8:9 51:5
looking 16:2

M

M 1:20 53:22 54:4
mailing 24:24
Main 2:4
March 32:13
mark 18:5 19:8 21:18 23:10 26:5,6,11,12,14 26:22,23 28:2 36:6 37:1 38:11,23,24 39:1 39:10 40:17 42:8 48:1 50:7 51:1 54:15,16
marked 4:1 5:5 6:15 8:24 11:17,20 12:8 22:7 23:15 29:24 30:3 30:18 38:8 39:23 40:2 45:14
marketing 43:24
marks 13:12 19:17 24:18 33:5,7 37:8 39:9,9 40:10 50:13
material 7:12,17
matter 26:12 54:20
matters 53:8
mean 26:10 28:4 31:11 32:15,24 33:13 46:20
means 28:6 46:7
member 35:4
memory 16:17 17:9 36:11,19
Merit 1:9 4:21,22 5:2 9:15 27:10 31:23 32:1 32:7 33:17 54:7
Merit's 23:12 27:11
method 49:19
Michaelson 9:4 10:7 45:6 47:23
Michaelson's 30:23
mini 52:5,7
minor 31:15
minute 7:4
minutes 36:16,16
missed 47:8
MML 1:8
monitor 33:7
monthly 44:24 46:22
Monticello 12:23
morning 8:19
move 9:22 48:10
moving 9:17

N

N 3:1
name 7:22 12:1 13:16 13:24 16:18 17:9,11 17:12 18:11,22 22:5 27:16 36:23 39:19 41:7,13,14,18 42:7,15 43:18,23 44:4,12,15 46:14
names 12:21
nature 28:15 45:12
need 45:20
needed 24:21 31:17
never 32:16 41:14,16
new 52:4
normal 35:10 38:1
Notary 53:2,23
note 10:15 48:5,7
notes 16:20
notice 10:6 24:2 28:24 29:3,7 32:6,13 38:7
November 29:15 31:24
number 30:15 34:18
numbered 22:18
numbers 25:18

O

oath 53:9
Object 27:18 37:23
objection 48:6 51:19
occurred 47:2
occurring 47:5
October 9:5 23:1 32:6 42:6
office 7:21 8:4,6 14:2 15:6 18:13 19:16,24 20:8,12,14,19 22:1,24 24:10,15 27:9 28:2 31:5,7 32:19 33:2,5 35:6 36:9 38:12 45:10 45:19 46:13 47:10 50:12,20,21
offices 30:23 45:6
official 33:3
OG 32:21
okay 7:6 11:10 25:1 39:17
once 46:19
on-line 20:6
opinion 45:11
oppose 32:3,5 33:8,9
opposed 20:17 27:10 49:18
opposer 20:16
opposing 20:18
opposition 27:9,11,15 29:1,3,4,7,10 31:21 32:7,14,17,18
option 34:17
order 45:20 52:2
original 52:7
outcome 53:18
outside 11:1 29:20 30:21

P

page 3:10 12:16 22:21 23:4 24:9,23 25:7,11 25:13,19 26:16 27:23 28:4 30:16 54:14,15 55:1 56:1,4
pages 22:17 24:6,7
paragraph 13:8
part 22:16 23:5 30:11 43:3
particular 13:16 14:12 18:5 26:7 28:7,11 34:10,13,16 35:19 36:3
parties 53:16,17 54:18
PARTRIDGE 2:3
party 20:18
password 35:5
patent 14:1 20:8,12,14 22:23 35:5 38:12
Pause 7:10 11:14 39:21
penalty 55:6
pending 4:24
People 33:6
percent 19:10 37:14 41:22 43:6
percentage 49:16
period 32:5 33:9 44:24 49:9
perjury 55:6
personally 49:10
phonetic 14:6,8,11,17 14:19,24 15:8 16:8,15 17:5 18:7,21,23 20:5 34:5,8,17,24 41:18 50:2,6,7,11,12,15,18 50:23 51:2,7,13,17
phonetics 14:13
physically 15:14 16:16
Plaintiff 1:7 2:2
please 4:5 10:1 52:4,5 54:13,14
point 9:17 29:11 44:6 44:11 48:2 50:19
portions 10:22,23
possible 51:16,20
practice 45:2
practices 6:11
practicing 48:23 49:3
preliminary 13:10,13 13:21,23 19:2,6 20:24 21:7,13,17 38:16 40:8
preparation 38:9
prepare 22:11 45:21
prepared 12:13
prescreening 42:6,13
present 50:18
presented 26:6
pretty 51:3
previously 5:5,18 8:21 10:15,20 12:6,8 22:7 23:15 31:14 41:4
primarily 45:3
principal 32:23 33:11 38:11
printout 28:1,3
prior 44:1,15 47:14
privilege 6:5,7 8:23 9:20 11:2 47:20
privileged 9:19
probably 17:12 19:20 28:19 29:3 33:22 36:13,14 37:4 38:6 39:10 41:10 44:17,19
problem 46:18 47:2,4 50:19
problems 46:24
Procedure 54:11
proceed 17:3
proceedings 7:10 11:14 32:19 39:21
produce 9:6
produced 5:19,22 6:1 7:15 8:21 10:15 17:1 24:3,4
product 34:1
production 9:18,22
Professional 1:21,22 53:24
prosecution 21:24 22:9 22:13 24:14 45:9
provide 34:8
provided 29:6
Providence 1:17 2:5,12 53:4
Public 53:2,23
publication 33:4
published 27:9 32:21 33:3
pull-down 34:22 35:16
purpose 26:11
purposes 19:9
pursuant 5:14 54:10
put 17:12 18:11,21 36:23 41:17

Q

question 9:24 10:3 14:21 26:21 27:19,22 30:14 37:24 43:14,19
questions 44:21 48:6,7 48:11,13,18 51:22,24
quite 15:1 21:10

R

R 37:18
raise 43:16,20,21
rarely 46:18
RATCLIFF 1:15 2:10 2:13
Ratcliffe 3:4 4:4,13,20 7:5,7 8:9,12 9:14 10:24 11:5,8,11,16 23:23 26:4 27:20 29:23 30:13 35:14 39:17 47:18 48:5 51:19,23 52:6 54:3
rate 38:18,20
rational 18:17
read 10:1,3 24:7 55:4 56:4

**really** 15:15 30:6 42:17 42:19 43:2 44:18 46:23
**reason** 20:20 26:1 39:12
**recall** 48:9 50:2
**receipt** 24:9 25:13,15
**received** 10:5 48:3
**recognize** 5:7 12:9 40:3 45:15
**recollection** 42:3
**record** 8:13,15 9:15 28:3 53:11
**records** 7:23 10:14 28:6 28:10
**RECROSS** 3:3
**redact** 39:18
**redacted** 13:3
**redaction** 9:6,7
**REDIRECT** 3:3
**redo** 41:5
**reduced** 53:10
**refer** 19:1 25:14
**reference** 24:5 46:20 47:8,11,15
**referred** 10:17 31:13,14 41:3
**referring** 23:17 25:18 26:16 29:19
**refresh** 42:2
**regarding** 7:21 12:20 16:23 44:13 46:14 47:23 48:13
**register** 13:17 21:18,23 22:5 32:22 33:11,14 38:12 42:18
**Registered** 1:21 53:24
**registration** 9:9 19:8 27:7 33:10,12 38:10 47:13,14 50:19
**registrations** 33:6
**related** 39:2
**relates** 9:7
**relation** 9:13
**relationship** 21:14
**relative** 53:14,16
**relatively** 19:7,9 43:1
**relevant** 28:21 36:8
**rely** 30:7,8 49:6
**remember** 16:19 41:23 47:1,4,6
**repeat** 27:21 43:19
**report** 3:12,13,14 12:12 12:14 39:8
**Reporter** 1:21,22 53:24
**represent** 4:20
**Representing** 2:2,9
**request** 13:10 31:20 34:5
**requested** 5:17
**requests** 6:19
**reserving** 48:9
**respect** 6:3 9:17 11:3 13:23 27:6 28:23 36:19 43:17 47:20
**responses** 48:11
**result** 46:14
**results** 14:4 37:3,16 50:10
**reviewed** 24:15
**reviewing** 8:17
**Rhode** 1:2,17 5:2 53:5
**RI** 2:5,12
**Richard** 2:13 54:3
**right** 8:7 18:2 25:7 26:2 26:9 32:9 46:8,11 48:4,9
**rights** 9:16
**River** 47:7
**Robert** 1:14 2:6 3:2 4:8 53:3 54:2,5 55:4,19
**rough** 49:16
**routine** 36:22
**RPR** 54:4
**Rules** 54:10
**run** 42:10 46:23
**R-E-N-A** 37:17,21 38:4

**S**

**Sagis** 20:5,9,11 21:1
**Salter** 1:14 3:2 4:8,15 5:19,22 6:9 8:18,22 9:4 10:7 30:23 45:6 46:14 47:22 48:8,16 53:3 54:5,11,13 55:4 55:19
**Salter's** 54:9
**says** 13:8 28:3 31:10 32:20 34:23 38:9
**screening** 12:4 13:11,13 13:20,21,23 19:2,6 40:8 42:17
**search** 5:20 11:24 12:4 12:12,14 13:11,14,21 13:23 14:7,13,16,17 14:20,24 15:7,8,21 16:9,11,13,13,14,17 16:21,24 17:4,9,10 18:7,9,14,21,22 19:2 19:6,10,15,19 20:7,12 20:22,24 21:6,7,8,15 21:17 24:16,17 27:16 28:7,9,11 34:5,6,10 34:13,16,21,22 35:2,9 35:10,16,18,21 36:3,5 36:10,12,20 37:3,16 37:17,19 38:22 39:8 40:8,9,23 41:5,18 42:6,10,13,17,17,18 42:21 43:5,6,11,22 44:18 46:16 47:8,10 47:16 49:12 50:2,6,10 50:10,17
**searched** 37:2
**searches** 12:21 14:8,9 14:11 15:1 19:4,5,12 20:3,22 21:9,13 34:19 38:16,17 44:14,23 45:8 46:17 49:6,11,17 49:22
**second** 8:13
**secretary** 31:4
**see** 5:20 13:16,16 22:17 24:17 26:4 33:7 37:8 41:6,6,12,13,18
**seeing** 37:16
**seeking** 33:18
**sense** 15:5 27:2 37:11
**sensitive** 39:19
**sent** 24:11,12 38:8
**separate** 32:19 39:5
**September** 32:22
**Serena** 7:22 9:10 12:1 13:1,24 14:16 15:11 16:18 17:10,11,12,19 17:20 18:11 22:5 26:22,24 28:9 29:18 35:21,22 36:20 37:9 41:7 42:7,15 43:18,23 44:4,4,12 48:1 51:11
**serenade** 17:24 28:13 28:14,16
**series** 9:1 15:24,24 16:3
**served** 5:11
**service** 34:2
**services** 9:8
**Seven** 49:1
**sheet** 54:16
**show** 12:7 30:18 34:12 40:2
**showing** 5:5 15:16 23:15 45:13
**shows** 17:23
**side** 17:16 31:6 35:23 37:11
**sign** 23:4 54:11,13
**signature** 54:14 55:1
**similar** 20:7 24:18
**Sirena** 23:10 27:16 28:2 41:14,20 46:15 51:12
**situation** 42:23 51:1
**situations** 45:11 51:4,8 51:9
**six** 28:3
**size** 26:8
**SNOW** 2:3
**soon** 18:21
**sort** 21:14 35:4
**sounds** 50:8
**South** 2:4
**so-called** 33:18
**speaks** 25:2
**special** 18:20 34:4
**specific** 16:17 17:8 36:18
**specifically** 9:2 34:16
**spelled** 12:1 17:14 37:10 50:8,14 51:12 51:12
**Spelling** 17:13
**standard** 23:6 25:22,23 26:6 31:16 33:14
**start** 21:12 35:17
**statement** 31:16 53:11
**states** 1:1 4:10,24 14:1
**STENOGRAPHER** 52:1,9
**step** 21:16
**strategies** 35:18 37:12
**strategy** 35:2,21 37:13
**Street** 2:4
**structured** 34:21 35:15
**style** 26:8
**stylized** 25:17,21 26:15 26:24 27:2,3
**subpoena** 3:11 4:1 5:10 5:11,15,17 6:8,13,15 6:19 8:1
**supposed** 18:22 34:7 50:11
**sure** 6:6 7:5 29:2 32:2 37:15 41:22 46:21 50:24 51:9,14
**Suzanne** 12:17 13:5,6,9 21:5 46:4
**Swear** 4:4
**sworn** 4:9 53:5
**system** 15:21 18:14 35:9 41:5,17 49:18,21 49:23
**S-E-R-E** 37:19
**S-E-R-E-N-A** 12:2 13:1 17:15 18:11,22 22:5 26:23 35:22 41:17 42:7 43:18,23 51:12 51:17
**S-I-R-E-N-A** 18:12 23:11 27:17 37:22 41:14 46:15 51:13,17

**T**

**take** 7:7 10:6 16:20 28:9 36:4 46:5,7 47:18 52:3,6
**Taken** 54:6
**takes** 36:6
**Taylor** 2:6 3:5 8:11,17 11:4,7,10 27:18 37:23 39:15,18 43:12 48:4 48:16,21 51:21 52:3 54:2
**tell** 14:10
**ten** 36:16
**terms** 25:2 50:23
**test** 15:21 27:15 34:5 35:6,13 41:5,17 49:18 49:21,23
**testify** 53:6
**testimony** 18:19 34:3 53:11
**Thank** 51:23 52:9 54:19
**thing** 28:22 31:19 32:10 50:16
**things** 6:4 21:1 35:1 45:11
**think** 28:15 41:9 42:9 51:2
**thinking** 38:6
**thirty** 45:1 54:11
**Thompson** 19:14,14,19 19:19 20:24 40:22
**thorough** 19:5 20:2,3 21:8 43:5,10

**three** 12:24 28:15,17 30:15,16
**time** 7:8 19:10 21:11 23:9,19 27:10 31:21 32:4 34:20 36:7,15 41:22 42:5 43:6 47:1 49:9
**titles** 16:3
**today** 10:8,12 12:7
**today's** 54:1,12
**top** 15:24 35:12
**touching** 53:7
**tough** 15:15
**Tower** 1:16 2:11
**trademark** 8:4,6 9:11 9:11 10:18 12:3,20 14:2 15:5,19,20 18:13 19:15,23 20:8,12,14 20:19 22:1,22,24 24:2 24:10,15 25:3 27:7,8 27:16 28:1,23 29:21 30:22 32:19 33:1,2,5 33:17,19,21,24 35:5,6 35:8,19 36:9 38:12 40:8 45:3,7,10 47:9 48:24 49:3,5,10 50:12 50:20,21
**trademarks** 9:10 33:15 33:15
**traditional** 17:14 37:10
**transcript** 52:2 54:17
**true** 30:20 53:11 55:6
**Trust** 1:16 2:11
**truth** 53:6,6
**turn** 42:21
**twenty-four** 28:4
**Twenty-seven** 26:18
**two** 9:9 12:23 24:6 28:12 31:7 32:18 50:13 51:4
**type** 16:12 20:15 21:6 21:15 25:17 33:11,17 33:21 45:5 49:12 50:9
**types** 19:3 20:22 34:19
**typing** 35:18

**U**

**uh-oh** 51:6
**uncover** 50:17
**uncovered** 28:7 37:8 47:15
**understanding** 50:6
**understood** 21:11 44:18
**undertaken** 48:14
**United** 1:1 4:24 14:1
**unregistered** 19:17 42:20
**use** 7:22 13:20,22 19:23 20:4,11 25:3 43:2,17 43:23 46:6,7,7
**user** 42:20
**usually** 40:17 42:9

**V**

**version** 27:3
**view** 50:19
**vs** 1:8 54:7

**W**

**W** 4:1 5:6 6:16
**waived** 9:21
**waiving** 9:16
**want** 16:12 30:8 33:8 43:4
**wanted** 32:3,3 48:17
**wasn't** 47:16
**way** 14:6,12 15:2,8,12 16:24 17:14 18:16 21:14 33:2 37:8 46:16
**ways** 15:6
**weekly** 33:4
**went** 10:6 16:24 27:8 40:22
**weren't** 32:2
**we're** 47:12
**we've** 21:9 31:13 41:3
**white** 51:1
**wild** 17:16 37:11,18,19 38:4
**window** 32:4 34:22 35:17
**withdrawal** 29:17
**witness** 3:2 4:5,8 25:9 30:6,12 48:10 53:12 53:19
**wonder** 51:6
**word** 17:17
**words** 13:15 17:19,20 17:24 25:17,22 49:16 51:4
**work** 45:5,11
**working** 21:10
**wouldn't** 30:6 42:21
**writing** 11:1 31:1 45:22 45:23 53:10
**written** 26:12,13 32:21
**wrong** 41:6

**X**

**X** 3:1 11:18,20 38:9

**Y**

**Y** 30:2,19
**years** 4:19 47:16 49:1,1 49:4

**Z**

**Z** 39:23 40:3

**$**

**$1,000** 19:21
**$15** 40:17
**$50** 40:16
**$950** 38:13

**0**

**02903** 2:5,12
**04-397** 1:8

**1**

**1** 3:11 31:10
**10** 32:13
**10:15** 1:18
**100** 37:14 41:21
**105** 3:12
**109** 3:14
**11:54** 52:11
**110** 3:13
**125** 3:15
**150** 38:21 39:10
**16** 54:1
**16th** 53:19
**1600** 1:16 2:11
**17** 29:15
**180** 2:4

**2**

**2A** 3:12
**2B** 3:13
**20** 4:19
**20004** 31:10
**2003** 9:5 23:1 42:7
**2004** 23:21 29:15 31:24 32:6,13,22
**2005** 1:18 53:4,19 54:1 54:6 55:9
**21** 27:23 28:5
**24** 23:20 28:6 32:6
**28** 27:17

**3**

**3** 3:14
**30-day** 32:4 33:9
**31** 9:5 23:1
**33** 24:6,8,13
**34** 24:6,8,9 25:13
**35** 24:23
**36** 22:21
**37** 23:4
**38** 25:11,19

**4**

**4** 3:4,15
**401.331.3400** 2:14
**401.861.8200** 2:7

**5**

**50** 49:4
**500** 19:20

**6**

**6** 3:11 31:24

**7**

**7** 32:22

**8**

**8** 1:18 54:6
**8th** 53:4

**9**

**9/15/04** 31:22,24
**95** 19:10 43:5
**99** 43:5